IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TRADE WELL INTERNATIONAL,

                Plaintiff,

DELLS LODGING OPERATOR, INC., and
DELLS ESTATE LLC,

                Involuntary Plaintiffs,

  v.

UNITED CENTRAL BANK,

                Defendant.

OPINION & ORDER

12-cv-701-jdp

---

      This court sanctioned plaintiff Trade Well International's counsel, attorney Maurice Salem, and withdrew his *pro hac vice* admission. After Trade Well failed to engage new counsel in the six months that followed, the court granted default judgment to defendant United Central Bank (UCB). But the Seventh Circuit ultimately reversed the sanction, and Salem is back on the case.

      Now that it is again represented by counsel, Trade Well has moved to set aside the default judgment. This is an extraordinary remedy that requires Trade Well to show three things: good cause for the default; quick action to remedy the default; and a meritorious case. Trade Well has made a sufficient showing on the merits. The critical issue for the remaining requirements, however, is whether Trade Well made adequate efforts to secure new counsel after Salem had been sanctioned. Trade Well is entitled to some leeway because the court's erroneous sanction contributed to the company's difficulties in engaging new counsel. But the court finds, after an evidentiary hearing, that Trade Well's efforts to find new counsel were so

casual and haphazard that Trade Well cannot show good cause for the default or quick action to correct it. Trade Well's motion to set aside the default judgment will therefore be denied.

FINDINGS OF FACT

The Seventh Circuit's opinion recounts the background of this case up to the appeal. *See Trade Well Int'l v. United Cent. Bank*, 778 F.3d 620, 621-25 (7th Cir. 2015). Only a brief summary of that sequence is required here. Trade Well is a Pakistani company that leased furnishings to the involuntary plaintiffs in this case, who operated a hotel in the Wisconsin Dells. The involuntary plaintiffs defaulted on their mortgage from UCB, which foreclosed and then purchased the hotel. Trade Well demanded the return of its furnishings, and when its demands were spurned, it filed a replevin action in this court.

During the course of the litigation, Salem filed a lien against the property to forestall the bank's sale of the hotel. The lien was irregular, in part because Salem was an out-of-state attorney admitted *pro hac vice*, rather than an attorney admitted to practice in Wisconsin. The lien nevertheless disrupted UCB's sale of the hotel to a third party.

On April 4, 2014, Judge Conley held Salem in contempt and revoked his *pro hac vice* admission as a sanction for filing the lien. Judge Conley also invited UCB to file a counterclaim for slander of title. As a corporation, Trade Well was unable to appear in court without counsel. Over the next six months, Trade Well was unable to secure new representation. On October 27, 2014, the court dismissed Trade Well's claims for failure to prosecute them, and it entered default judgment against Trade Well on the counterclaims that UCB filed. Salem appealed the sanctions against him to the Seventh Circuit, which

reversed those sanctions on February 10, 2015. A month later, this court reinstated Salem's *pro hac vice* privileges and reassigned the case to a different judge.

On March 26, 2015, Trade Well moved to vacate the default judgment. Dkt. 125. The court held an evidentiary hearing on Trade Well's motion. Thus, the court draws the following facts from the record in this case, Trade Well's post-judgment submissions, and the testimony presented at the hearing.

Salem testified that Trade Well was keenly concerned to get new counsel because the case involved property worth $2 million. Between April 4, 2014, when Salem's *pro hac vice* admission was revoked, and June 25, 2014, Salem spoke to four law firms and approximately ten attorneys or law firms in Wisconsin and Illinois about taking the case. At the hearing, Salem testified that he contacted between 50 and 100 attorneys following the court's entry of default judgment in October 2014. But none of Salem's filings ever mentioned such an extensive search; those filings consistently stated that he contacted four firms and "more than 10" attorneys. *See, e.g.*, Dkt. 127, ¶ 5 and Dkt. 131, ¶ 12. The only documentation that Salem presented was a list of nine attorneys, with phone numbers, plus the names of Salem's two attorney friends in Illinois, Dkt. 131-2, although Salem testified that he had additional notes at home in his son's spiral notebook. The court finds Salem's hearing testimony that he contacted more attorneys than he reported in his declarations, and that he had additional documentation of his contacts, to be exaggerated and not credible. The court further finds that Salem contacted approximately 14 attorneys, and that most of these contacts were made between April and June 2014.

Salem's primary method for identifying potential counsel was to use Google to search for lawyers in Madison. Salem testified that he called this court's clerk's office to ask for a list

of attorneys to contact. The clerk's office referred him elsewhere (Salem does not recall where), but he did not pursue that avenue. At the hearing, in response to cross-examination, Salem said that he had used PACER to verify the qualifications of the attorneys who he contacted. But the court does not find this testimony to be credible. Many of the attorneys with whom Salem spoke were criminal law practitioners—something Salem would have been able to verify had he in fact used PACER. The court finds that Salem made no substantial effort to specifically identify counsel who would be likely to undertake commercial civil litigation in federal court.[1]

In presenting the case to prospective counsel, Salem usually said only that he needed someone to take over the matter, and he provided the case number. Salem was embarrassed by the sanction and did not want to discuss it. In the case of some of the later contacts, Salem explained the situation so that he could get quicker responses. None of the attorneys who Salem contacted agreed to take Trade Well's case, and Salem testified that he had the impression that Madison attorneys were afraid to take the case because they did not want to jeopardize their relationship with this court. But none of the attorneys actually *said* this to Salem. Salem testified that one attorney (he did not remember who) described the case as a "hot potato." Salem could not recall his conversations with five of the attorneys whom he had contacted, and he was unable to specifically describe any reasons that the Wisconsin attorneys gave for declining to take the case. Salem recounted that two of his attorney friends in Illinois declined to take the case because they were afraid that dark-skinned Asian attorneys would face unfair prejudice in this court.

---

[1] Salem also testified the he, and personnel from Trade Well, asked the Pakistani embassies in both the United States and in Pakistan for help. A request to the embassies is not a reasonable means of securing representation in commercial litigation in federal court.

In October 2014, Trade Well also engaged Umar Paracha, the brother of one of the company's owners, to help find an attorney. Paracha met with Trade Well's officers and in-house counsel in Pakistan on two occasions. Paracha, who had hired attorneys for his own matters approximately 10 to 15 times in the past, testified that he had contacted 10 to 15 attorneys to inquire about representing Trade Well. But his handwritten notes contain information about only three attorneys, and he had a business card for one more. The court finds that Paracha's testimony is exaggerated, and that he contacted approximately four attorneys beginning in October 2014.

Like Salem, Paracha primarily used Google to search for Madison attorneys, although one of Paracha's contacts arose from a chance encounter with a stranger who turned out to be an attorney. Paracha did not contact the attorneys who had represented him in previous cases to inquire about representing Trade Well or to solicit names of other attorneys who might take the case.

Paracha was unable to secure new representation for Trade Well. Paracha believed that attorneys were afraid to take Trade Well's case because they thought that they would not be able to win it. But he did not remember specifically what any attorneys said to him.

An affidavit from Paracha's brother, Muhammad Tahir, one of Trade Well's owners, states that the company instructed Salem and Paracha "to offer more money, than typical[ly] offered, to any attorney willing to take [the] case." Dkt. 131-1, ¶ 8. Despite this direction, neither Salem nor Paracha ever mentioned Trade Well's willingness to pay a substantial fee to any of the attorneys whom they contacted. In fact, neither Salem nor Paracha ever discussed payment at all with any prospective counsel.


ANALYSIS

Trade Well moves to set aside the judgment against it as void under Federal Rule of Civil Procedure 60(b)(4), and to set aside the court's entry of default against it under Rule 55(c). "Although the elements for relief under Rule 55(c) and Rule 60(b) are substantially the same, the standards are applied more stringently when considering a motion to vacate a default judgment under Rule 60(b)." *Chrysler Credit Corp. v. Macino*, 710 F.2d 363, 368 (7th Cir. 1983). "[T]o have a default judgment vacated, the moving party must demonstrate: (1) good cause for the default; (2) quick action to correct it; and (3) a meritorious defense to the complaint." *Wehrs v. Wells*, 688 F.3d 886, 890 (7th Cir. 2012) (internal citations and quotation marks omitted). But "[a]s a general rule, relief from a judgment under Rule 60(b) is an extraordinary remedy and is granted only in exceptional circumstances." *Bakery Mach. & Fabrication, Inc. v. Traditional Baking, Inc.*, 570 F.3d 845, 848 (7th Cir. 2009) (internal citations and quotation marks omitted).

The court is satisfied that Trade Well has adequately articulated meritorious defenses to UCB's counterclaims and meritorious affirmative claims. But the evidence and testimony that Trade Well has presented is not sufficient to satisfy Trade Well's burden to demonstrate good cause for its default and failure to prosecute. Nor has Trade Well demonstrated quick action to correct the default. The court must therefore deny Trade Well's motion to set aside the judgment.

The court begins with the good cause element, which concerns the effort to find new counsel between April 4, 2014, and October 27, 2014. Trade Well contends that the court's sanctions made it difficult for the company to find new representation. The court is sympathetic to this point, but Salem's sanctions did not relieve Trade Well of its obligation

to participate in a lawsuit that it began. Trade Well chose to rely on Salem to find new counsel, as it was entitled to do. Salem's admission to this court had been revoked, but that action did not prevent Salem from otherwise representing Trade Well. Unfortunately for Trade Well, Salem's efforts were too erratic and disorganized to constitute a diligent search for new representation. The only documentation that Salem has is a list of attorneys with phone numbers. Dkt. 131-2. Salem did not record the dates or times of his calls, what he said to these attorneys, or the reasons that they gave for declining to take the case. Critically, Salem admitted that he offered no explanation for the state of the case, or assurances to the prospective counsel that Trade Well was willing and able to pay.

Trade Well engaged Paracha in October 2014, so his efforts were likely too late to avoid the default. But even if they had been in time, Paracha's efforts were too erratic and disorganized to constitute good cause. Paracha was a moderately sophisticated consumer of legal services: he testified that he had hired attorneys 10 or 15 times. But he, too, offered prospective counsel no explanation for the status of the case, nor any assurances about payment.

Salem and Paracha searched the internet for attorneys in Madison, principally using Google. They did not search specifically for civil practitioners or for attorneys who would be familiar with this type of case. The result was that at least a few of the lawyers with whom they spoke were criminal law practitioners: not ideal candidates for handling a civil case involving conversion and slander of title. Neither Salem nor Paracha testified that they asked prospective counsel to recommend other practitioners who specialized in this area of law or who might take the case. These are measures that the court would have expected Trade Well to pursue when it was facing impending default.

Salem and Paracha also failed to mention to prospective counsel a compelling reason to take this case: a paying client. The notion that Trade Well's assurance of a substantial fee would not have enticed a single attorney to accept the case—had Salem and Paracha conveyed that assurance—is simply not credible. Salem and Paracha testified that their negotiations did not get far enough to discuss fees. But they did not persuasively explain why fees were not among the *first* topics in their conversations with other attorneys. Based on the evidence and testimony presented, the court finds that Trade Well failed to conduct a reasonable and diligent search for new counsel to avoid default. Thus, Trade Well has not demonstrated good cause for its default.

The second element, quick action to set aside the default, concerns Trade Well's actions after October 27, 2014. Trade Well's inadequate efforts to find new counsel also prevent the company from showing that it acted promptly to set aside the default. Trade Well contends that there was no delay because it filed a motion to set aside the default judgment just nine days after the previous judge recused himself from this case. Dkt. 126, at 4. But "Rule 60(b) focuses on relief from judgments, [and so] the 'quick action' prong of the standard for vacating default judgments must concern itself with the time elapsing between *entry of judgment* and the motion to vacate." *Jones v. Phipps*, 39 F.3d 158, 165 (7th Cir. 1994) (emphasis added). The court entered judgment on October 27, 2014. Dkt. 116. Thus, Trade Well waited for five months before moving to vacate the judgment against it, not nine days.

What counts as quick action will vary from case to case, *Jones*, 39 F.3d at 165, and courts have held that as little as three weeks is too long a time to wait before moving to set aside a judgment. *See, e.g.*, *Sullivan v. Gen. Plumbing, Inc.*, No. 06-cv-2464, 2007 WL 1030236, at *4 (N.D. Ill. Mar. 31, 2007). Five months may not be too long *per se*, but in this

case, for mostly the same reasons that Trade Well cannot demonstrate good cause for its default, the court must conclude that Trade Well did not act promptly. It is particularly telling that Trade Well has not presented detailed evidence of *ongoing* efforts to secure new counsel since October 2014. Indeed, the four or so attorneys whom Paracha contacted constitute Trade Well's only demonstrable effort to find representation after the court entered judgment.

"Quick action to attack a default judgment is required because the cement of finality hardens each and every day beyond the entry of the judgment; the winning party increasingly fashions its expectations and affairs on having and holding the judgment as time passes." *Jones*, 39 F.3d at 165. UCB did nothing wrong in this case, and it is entitled to closure. Trade Well's delay in moving to reopen the case upsets that entitlement. After an initial effort to find counsel, Trade Well apparently gave up the search in hopes that the Seventh Circuit would vacate the sanctions against Salem. That was a strategic choice for Trade Well. But without evidence demonstrating a continuous effort to find counsel, the court concludes that Trade Well did not act promptly to set aside the judgment against it.

Two closing points. First, Trade Well has challenged the judgment as void for lack of personal jurisdiction. *See* Dkt. 131, at 2-3. But Trade Well is the plaintiff in this case, and it submitted to the court's jurisdiction by filing a complaint. UCB served a counterclaim on Trade Well, pursuant to Rule 5. *See* 1 James Wm. Moore, *Moore's Federal Practice* § 5.02[1][a] (3d ed. 2014). Personal jurisdiction was therefore secure.

Second, Trade Well has challenged the judgment as void for lack of subject matter jurisdiction, contending that UCB's counterclaims were part of Salem's appeal to the Seventh Circuit. Dkt. 131, at 3-4. But Salem's appeal raised a purely personal issue: the propriety of

9

the court's sanctions against him. The substantive issues of this case were not part of the appeal (even "implicitly," as Salem has argued to this court). The Seventh Circuit's opinion expressly states that "[t]he only part of this messy case that is before us is Salem's appeal from the various measures the court took against him. . . . We are . . . not concerned with any possible appeal by Trade Well contesting the default judgment or the finding of a failure to prosecute." *Trade Well Int'l*, 778 F.3d at 625. Salem's appeal did not divest this court of subject matter jurisdiction over Trade Well's case.

Trade Well has failed to carry its burden of establishing good cause for its default and for its failure to prosecute. Trade Well has also failed to carry its burden of establishing quick action to set aside the default. Trade Well's jurisdictional challenges lack merit. Thus, the court must deny Trade Well's motion to set aside the judgment.

ORDER

IT IS ORDERED that:

1. Plaintiff Trade Well International's motion to vacate orders granting default judgment on the counterclaim, nullifying a lien, and dismissing this action, Dkt. 125, is DENIED.

2. Defendant United Central Bank's motion to strike, Dkt. 127, is DENIED as moot.

Entered September 23, 2015.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge